FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GAVIN LEE BUCK,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner Social Security,<br>*Defendant-Appellee.* | No. 14-35976<br><br>DC No.<br>2:13-cv-02283-JCC<br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, Senior District Judge, Presiding

Argued and Submitted July 10, 2017
Seattle, Washington

Filed September 5, 2017

Before: A. Wallace Tashima and Jacqueline H. Nguyen,
Circuit Judges, and Donald E. Walter,[*] District Judge.

Opinion by Judge Tashima

---

[*] The Honorable Donald E. Walter, United States District Judge for
the Western District of Louisiana, sitting by designation.

## SUMMARY[**]

### Social Security

The panel reversed the district court's judgment affirming the Commissioner of Social Security's denial of claimant's applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, and remanded for further administrative proceedings.

The panel rejected claimant's contentions that the administrative law judge ("ALJ") erred at step two of the five-step sequential analysis by not adequately incorporating all severe impairments into the determination of claimant's residual functional capacity, and by calling his antisocial personality disorder merely a "personality disorder" without qualification. The panel held that step two is merely a threshold determination meant to screen out weak claims, and was not meant to identify the impairments that should be taken into account when determining the residual functional capacity. The panel further held that step two was decided in claimant's favor, and he could not possibly have been prejudiced, and any alleged error was therefore harmless.

Concerning the rejection of Dr. Kenderdine's opinion, which involved a psychiatric evaluation, the panel held that in the context of this case, Dr. Kenderdine's partial reliance on claimant's self-reported symptoms was not a valid reason to reject his opinion. The panel also held that the ALJ's use of the opinion of a non-examining medical expert (which was

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

rejected by the opinion of another non-examining physician) to reject Dr. Kenderdine's opinion was not a valid basis for rejecting Dr. Kenderdine's opinion.

The panel held that the law of the case doctrine did not preclude this court from considering claimant's arguments regarding the ALJ's treatment of the opinions of Drs. Schechter and Fisher – where the district court, in a prior appeal, affirmed the ALJ's treatment of those opinions and remanded for a second hearing before the ALJ – because the law of the case doctrine applies only to decisions by the same or a higher court. The panel held that the ALJ did not err in rejecting the opinion of Dr. Schechter where there was a discrepancy between the physician's opinion and the physician's own notes. The panel also held that the ALJ correctly interpreted Dr. Fisher's opinion, which was submitted on a form, by relying solely on the third section of the form where the physician wrote his narrative opinion.

The panel held that the vast discrepancy between the vocational expert's testimony concerning job numbers and those tendered by the claimant was too striking, and concluded that the inconsistency in the record must be addressed by the ALJ on remand.

## COUNSEL

Charles W. Talbot (argued), Tacoma, Washington, for Plaintiff-Appellant.

Jeffrey Raymond McClain (argued), Assistant Regional Counsel; David Morado, Regional Chief Counsel, Seattle Region X; Kerry Jane Keefe, Assistant United States

Attorney; Annette L. Hayes, United States Attorney; Office of the General Counsel, Social Security Administration, Seattle, Washington; for Defendant-Appellee.

## OPINION

TASHIMA, Circuit Judge:

Gavin Buck ("Buck") appeals the district court's judgment affirming the denial of Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits. Buck is diagnosed with several mental illnesses, including bipolar disorder, antisocial personality disorder, and attention deficit hyperactivity disorder ("ADHD"). We have jurisdiction under 28 U.S.C. § 1291 and we reverse and remand for further administrative proceedings.

## I.  FACTUAL BACKGROUND

Buck was born in 1977. He has worked in the past as, among other things, a stores laborer, construction laborer, and tire changer. The longest he was ever employed was 17 months, working for Pioneer Human Services as a shipping and receiving worker.[1] Buck attributes his failure to keep a job to his mental illnesses, which cause him to miss a lot of work. He also has trouble concentrating and tends to get nervous around people and lash out at them.

---

[1] Pioneer Human Services is a company that hires people re-entering society from prison or jail or who are battling drug addictions. *See Job Listings*, PIONEER HUMAN SERVICES, http://pioneerhumanservices.org/about/career (last visited July 31, 2017).

The medical record in this case begins with an examination by Dr. Shawn Kenderdine, Ph.D., on May 19, 2008. Dr. Kenderdine performed his examination on behalf of the Washington Department of Social and Health Services ("DSHS"). Dr. Kenderdine performed both a clinical interview and a mental status evaluation. Buck's results indicated that his learning would be impaired to some degree. Dr. Kenderdine diagnosed Buck with ADHD, methamphetamine dependence in remission, major depressive disorder, and antisocial personality disorder. He assessed limitations in Buck's ability to exercise judgment and make decisions, to relate appropriately to co-workers and supervisors, to respond appropriately to and tolerate the pressures of a work setting, to control physical or motor movements, and to maintain appropriate behavior. In addition to his clinical observations, Dr. Kenderdine also noted that Buck "reported attendance problems and poor attention as interfering with his ability to sustain or maintain work."

Starting in July 2008, Buck received treatment from Valley Cities Counseling and Consultation ("Valley Cities"). A mental status examination by Valley Cities found that Buck had an anxious affect, impaired concentration, poor impulse control, and poor insight into his problems.

Buck filed applications for SSDI and SSI benefits on September 17, 2008, with an alleged onset date of March 1, 2008.

On November 13, 2008, Buck was examined by Dr. Allison Schechter, Psy.D., at the request of the Social Security Administration ("SSA"). Dr. Schechter reviewed Dr. Kenderdine's report, a psychiatric evaluation done at

Valley Cities, and Valley Cities' treatment notes. She also conducted an interview and a mental status evaluation. Dr. Schechter diagnosed Buck with ADHD (combined type, childhood onset), bipolar disordar (not otherwise specified), adult antisocial behavior, and methamphetamine and marijuana dependence (in remission per history). She assigned a Global Adult Functioning ("GAF") score of 60. Functionally, Dr. Schechter opined that Buck might have difficulty performing both simple and repetitive tasks, as well as detailed and complex tasks. In addition, Buck would easily become irritated and act out inappropriately when irritable. Overall, Buck's disorders would interfere with his ability to work consistently and on a regular schedule.

In December 2008, Dr. Alex Fisher, Ph.D., performed a psychiatric review of Buck's file for the SSA. He diagnosed Buck with ADHD and bipolar disorder. He determined that Buck was only moderately functionally limited. Dr. Fisher's results were affirmed by Dr. Mary Gentile, Ph.D.

This case has been heard by an Administrative Law Judge ("ALJ") twice. The first hearing was in September 2009. At that hearing, Dr. Arthur Lewy, Ph.D., testified as a medical expert. Dr. Lewy opined that Buck has only mild limitations in daily living and social function, and moderate limitations in concentration, persistence, and pace, and concluded that Buck could do simple, repetitive work. Dr. Lewy further opined that the Schechter report was not reliable because Dr. Schechter frequently qualified her conclusions with the word "may." In addition, he noted discrepancies between Dr. Schechter's notes and her conclusions. For example, she assessed a GAF score of 60, which implies only moderate symptoms, but her conclusions indicated severe symptoms.

The ALJ denied Buck's claims for benefits. This denial was eventually appealed to the district court, which remanded the case to the ALJ. One of the reasons for the remand was that the ALJ improperly rejected Dr. Kenderdine's opinion.

On April 30, 2009, Richard Hockett B.A. ("Hockett") performed an assessment of Buck at the request of the DSHS. He diagnosed Buck with bipolar I disorder and ADHD. He assessed marked functional limitations in ability to remember and follow simple or complex instructions, in the ability to exercise judgment and make decisions and to perform routine tasks. He also noted a moderate limitation on the ability to learn new tasks. Hockett wrote that Buck was severely impaired socially, unable to respond appropriately to and tolerate the pressures and expectations of a normal work setting, and markedly limited in the ability to relate appropriately to co-workers, supervisors, and the public.

Buck did not obtain treatment between 2009 and 2011. When he went for treatment at Valley Cities in March 2011, he reported increased anxiety and depression.

Buck went to prison at some point after April 24, 2012. He was shot in the legs by police while fleeing arrest. The ALJ considered Buck's eligibility for benefits both before and after he sustained these gunshot wounds.

On remand, Buck had a second hearing before the same ALJ. Dr. Jay Toews, Ph.D., testified as a medical expert at this hearing. Dr. Toews testified that Buck would be capable of remembering and understanding simple instructions, carrying out routine tasks, and could tolerate incidental contact with others. He also testified that Dr. Kenderdine's opinion was unreliable because the Beck depression index

used by Dr. Kenderdine produces exaggerated scores at the high end of the scale. Specifically, Buck had a Beck depression score of 41, and Dr. Toews testified that scores over 30 are "exaggerations of true scores." After the ALJ had already issued his ruling, Buck submitted an additional sworn declaration by Dr. Brett T. Copeland, Psy.D., stating that there is no support for Dr. Toews' testimony that Beck scores are exaggerated.

Vocational expert ("VE") Jerie Longacre also testified at Buck's second hearing. She was asked to consider a hypothetical individual who was capable of work at all exertional levels; who could understand, remember, and carry out simple instructions; who could carry out routine tasks; who could tolerate incidental contact with others in a work place; and who would have problems with frequent changes in work requirements. These limitations correspond to the residual functional capacity ("RFC") that the ALJ assessed. The VE testified that someone with Buck's limitations would be able to perform Buck's past work as a stores laborer, tire changer, construction laborer, or shipping and receiving worker.

The VE also testified that after his gunshot wounds, Buck could work in computer assembly, as a bottling line attendant, a bottle packer, or as a conveyor-belt maker. The ALJ posed a third hypothetical, in which the individual would be limited to sedentary work. The VE responded that such an individual could work as a surveillance systems monitor, document preparer, or food and beverage order clerk.

The VE testified that the occupations of bottling line attendant, bottle packer, and conveyor belt maker had national job numbers of 600,000, 8,800, and 235,000,

respectively, and Washington state job numbers of 16,000, 200, and 4,400, respectively. Buck's attorneys, allegedly using the same software program as the VE, determined that there are only 231 positions nationally as a bottling line attendant, with six in Washington; 2,039 positions nationally as a bottle packer, with 51 in Washington; and 26 positions nationally as a conveyor belt maker, with none in Washington. The ALJ curtailed Buck's cross-examination of the VE on the issue of job numbers, promising Buck that he would be able to make a post-hearing submission. In the end, however, the ALJ did not address Buck's submission.

The ALJ issued his decision denying Buck benefits on May 17, 2013. Applying the five-step sequential analysis used in disability claims, the ALJ first found that Buck had not engaged in substantial gainful activity since his alleged onset date of March 1, 2008. At step two, he found that Buck suffered from five severe impairments: ADHD, bipolar disorder, personality disorder, marijuana dependence (in remission), and methamphetamine dependence (in remission). As of April 24, 2012, Buck also had the severe impairment of status post gunshot wounds in both lower extremities with fractures in the left leg. At step three, the ALJ found that Buck's impairments do not meet or equal a listed impairment.

In assessing Buck's RFC, the ALJ found Buck's own testimony to be not credible. He noted that Buck had made inconsistent statements regarding his work history, education, and substance abuse and that he had a significant criminal history, including crimes of dishonesty.

The ALJ found that before he was shot, Buck had the RFC to perform work at all exertional levels, with the ability to understand, remember, and carry out simple instructions

and routine tasks, and the ability to tolerate incidental contact with others in the workplace.  Buck would have problems, however, with frequent changes in work environments.  After he was shot, Buck's RFC would have the same non-exertional limitations as before, but he would additionally be limited to light work.

At step four, the ALJ found that prior to being shot, Buck could perform his past relevant work as a stores laborer, tire changer, and construction laborer.  At step five, the ALJ found that after being shot Buck could work as a bottling line attendant, bottle packer, conveyor-belt maker, surveillance systems monitor, document preparer, and food and beverage order clerk, just as the VE had testified.  Buck was therefore found not disabled.

Buck appealed to the Appeals Council, which denied his request for review.  He then appealed to the district court. The magistrate judge issued a Report and Recommendation affirming the ALJ's decision.  The district judge adopted the magistrate judge's Report and Recommendation.  Buck timely appealed.

## II.  STANDARD OF REVIEW

This Court reviews the district court's judgment affirming an ALJ's denial of Social Security benefits *de novo*.  *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).  This Court should reverse only if the ALJ's decision was not supported by substantial evidence in the record as a whole or if the ALJ applied the wrong legal standard.  *Id.*  The Court may not reverse an ALJ's decision on account of a harmless error.  *Id.* at 1111.

## III. STEP TWO ANALYSIS

Disability claims are evaluated using a five-step sequential analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, App. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

Buck contends that the ALJ made two errors at step two of this analysis. First, he contends that the ALJ did not adequately incorporate all severe impairments into the determination of Buck's RFC. Second, he contends that the

ALJ erred by calling his antisocial personality disorder merely a "personality disorder," without qualification. Neither contention has merit.

At the first hearing on Buck's claim, the ALJ found only two severe disabilities: ADHD and bipolar disorder. After the first hearing, under the RFC determined by the ALJ, Buck could perform a full range of work at all exertional levels; he was capable of understanding and remembering simple instructions and capable of carrying out routine tasks in a reliable manner, that he had the ability to tolerate incidental contact with others while at work; and he would have problems coping with stress involved in frequent changes.

After the second hearing, the ALJ found three new severe impairments at step two: personality disorder, marijuana addiction (in remission), and methamphetamine addiction (in remission). Buck argues that the addition of new severe impairments should have altered the RFC. However, aside from some changes in wording, the RFC determined after the second hearing was the same as after the first.

Buck misunderstands the purpose of step two in the analysis. Step two is merely a threshold determination meant to screen out weak claims. *Bowen v. Yuckert*, 482 U.S. 137, 146–47 (1987). It is not meant to identify the impairments that should be taken into account when determining the RFC. In fact, "[i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Titles II & XVI: Assessing Residual Functional Capacity in Initial Claims*, Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996). The RFC therefore *should* be exactly the same regardless of whether certain

impairments are considered "severe" or not. Here, all impairments were taken into account both times.

Moreover, step two was decided in Buck's favor after both hearings. He could not possibly have been prejudiced. Any alleged error is therefore harmless and cannot be the basis for a remand. *Molina*, 674 F.3d at 1115.

Buck also makes much of the fact that the ALJ identified his antisocial personality disorder as merely a "personality disorder," without the qualification "antisocial." This argument is unpersuasive. There is no indication that the ALJ misunderstood the nature of Buck's impairments. Absent other evidence, using the shorthand "personality disorder" does not indicate any error in the ALJ's determination of Buck's RFC or any other part of the analysis. Any alleged "error" is therefore harmless. *Id.*

## IV.  THE KENDERDINE OPINION

Buck argues that Dr. Kenderdine's partial reliance on Buck's self-reported symptoms was not a valid reason for the ALJ to reject his opinion. He also argues that the ALJ erred in relying on the opinion of Dr. Toews, a nonexamining medical expert, in rejecting Dr. Kenderdine's opinion.

### A.  Self-Reports in Psychiatric Evaluations

"A physician's opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) (internal quotation marks and citation omitted).

Dr. Kenderdine's opinion was based in part on Buck's self-report that he had trouble keeping a job. However, Dr. Kenderdine also conducted a clinical interview and a mental status evaluation. These are objective measures and cannot be discounted as a "self-report."

Moreover, as two other circuits have acknowledged, "[t]he report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology . . . ." *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873–74 (D.C. Cir. 1987)). Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry. *See Poulin*, 817 F.2d at 873 ("[U]nlike a broken arm, a mind cannot be x-rayed.").Thus, the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness. In the context of this case, Dr. Kenderdine's partial reliance on Buck's self-reported symptoms is thus not a reason to reject his opinion.

## B. Conflicts Between Examining and Nonexaming Medical Opinions

"The opinion of an examining physician is . . . entitled to greater weight than the opinion of a nonexamining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), *as amended* April 9, 1996. If the opinion of an examining physician is contradicted by the opinion of another doctor, it may nevertheless be rejected only "for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31. "The opinion of a nonexamining

physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion [of] an examining physician . . . ." *Id.* at 831. Thus, the opinion of Dr. Toews, a nonexamining medical expert, is not substantial evidence permitting the rejection of Dr. Kenderdine's opinion.

Further, Dr. Toews' opinion is itself contradicted by the opinion of another nonexamining physician, Dr. Copeland. Dr. Copeland concluded that the Beck inventory does not produce exaggerated results and that there is no professional support for Dr. Toews' opinion. This conflict in the record corroborates the rejection of Dr. Toews' testimony as a basis for rejecting Dr. Kenderdine's opinion.

## V.  SCHECHTER AND FISHER OPINIONS

Buck argues that the opinion of Dr. Schechter was improperly rejected by the ALJ. He also argues that the ALJ should have considered "section I" of the form used by Dr. Fisher in his opinion. The Commissioner argues that both of these issues are precluded by law of the case.

### A.  Law of the Case

Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993). This case was previously appealed to the district court, where it was remanded for a second hearing before the ALJ. In that decision, the district court affirmed the ALJ's treatment of the opinions of Drs. Schechter and Fisher. That affirmance was not appealed. The Commissioner apparently believes that this Court should be bound by that district court ruling. The

law of the case applies, however, only to decisions by the same or a higher court. While it was appropriate for the district court below to affirm based on law of the case, this Court is not bound to do the same. We therefore assess the ALJ's treatment of the Schechter and Fisher opinions on the merits.

## B.  Schechter Opinion

A physician's opinion can be discredited based on contradictions between the opinion and the physician's own notes. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). Dr. Schechter's notes indicate much less severe symptoms than her opinion. For example, she gave Buck a GAF score of 60, which indicates only moderate symptoms. By contrast, her opinion describes severe symptoms, such as screaming and breaking things for days straight. In light of this discrepancy, the ALJ did not err in rejecting Dr. Schechter's opinion.

## C.  Fisher Opinion

Dr. Fisher's opinion was submitted on a form, the first section of which is a checklist of symptoms. The third section of the form is where the physician writes the narrative opinion. Buck complains that the ALJ only considered the third section of the form and ignored the first section. His argument lacks merit.

Although not binding law, the Social Security Administration's Program Operations Manual System ("POMS") is persuasive authority. *Warre v. Comm'r of Soc. Sec. Admin*, 439 F.3d 1001, 1005 (9th Cir. 2006). POMS

contains a section explaining the form used by Dr. Fisher. It states:

> The purpose of section I ("Summary Conclusion") on the SSA-4734-F-SUP is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities . . . . It is the narrative written by the psychiatrist or psychologist in section III ("Functional Capacity Assessment") of form SSA-4734-F4-SUP that adjudicators are to use as the assessment of RFC.

POMS DI 25020.010(B)(1), *available at* https://secure.ssa.gov/poms.nsf/lnx/0425020010 (last visited July 12, 2017). The ALJ thus correctly interpreted the form by relying solely on the third section, rather than the first.

## VI.  VE TESTIMONY

### A.  Jobs with Reasoning Level 3

Buck argues, and the Commissioner concedes, that three of the jobs identified by the VE should have been excluded for having a Reasoning Level of 3.

The VE testified that Buck could do the jobs of surveillance systems monitor, document preparer, and food and beverage order clerk. These three positions all have a Reasoning Level of 3 in the Dictionary of Occupational Titles. However, Buck's RFC limits him to simple instructions and routine tasks. We recently held that a limitation to simple, routine, or repetitive work is inconsistent

with Reasoning Level 3.  *Zavalin v. Colvin*, 778 F.3d 842, 846–48 (9th Cir. 2015).  In light of Buck's RFC, Buck is not capable of doing the three identified jobs, and they should not have been relied on by the ALJ.  Nonetheless, this error may be  harmless because the VE identified other jobs that Buck could do, namely those of bottling line attendant, bottle packer, and conveyor-belt maker.**[2]**  *See Molina*, 674 F.3d at 1115.

## B.  Available Job Numbers

"An ALJ may take administrative notice of any reliable job information, including information provided by a VE." *Bayliss*, 427 F.3d at 1218.  "A VE's recognized expertise provides the necessary foundation for his or her testimony. Thus, no additional foundation is required."  *Id.*

Buck erroneously reads the above language from *Bayliss* to require that the ALJ independently assess the reliability of VE testimony.  However, as is clear from the language of *Bayliss*, at least in the absence of any contrary evidence, a VE's testimony is one type of job information that is regarded as inherently reliable; thus, there is no need for an ALJ to assess its reliability.

Notwithstanding the foregoing, VE testimony is not incontestable. For example, our precedent establishes that when VE testimony conflicts with the *Dictionary of*

---

**[2]** The evidence supporting the prevalence of these jobs in the national and regional economy is discussed in the immediately following section. If there are not sufficient numbers of these jobs, this error would not be harmless.

*Occupational Titles*,[3] the ALJ must "determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the *Dictionary of Occupational Titles*." *Massachi*, 486 F.3d at 1153; *see also* SSR 00-4p, 2000 WL 1898704, at *2 (S.S.A. Dec. 4, 2000) ("Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the [*Dictionary of Occupational Titles*]. . . . At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency."). Likewise, when the VE's testimony on job numbers conflicts with the Medical-Vocational Guidelines ("Grids")[4], the ALJ must "clarif[y] and develop[] the record." *Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989). In this case, the vast discrepancy between the VE's job numbers and those tendered by Buck, presumably from the same source, is simply too striking to be ignored. *See supra* at 8–9. This inconsistency in the record must be addressed by the ALJ on remand.[5]

---

[3] "In making disability determinations, the Social Security Administration relies primarily on the *Dictionary of Occupational Titles* for information about the requirements of work in the national economy." *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir. 2007).

[4] The Social Security Administration frequently uses Grids as a framework for the step five determination. POMS DI 25025.005, *available at* https://secure.ssa.gov/apps10/poms.NSF/lnx/0425025005 (last visited July 12, 2017).

[5] Our recent opinion in *Shaibi v. Berryhill*, No. 15-16849, 2017 WL 3598085, at *6 (9th Cir. Aug. 22, 2017), holding that "when a claimant fails entirely to challenge a vocational expert's job numbers during administrative proceedings before the agency, the claimant waives such a challenge on appeal," does not apply to this case because Buck's

## VII. CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed and the action is remanded to the district court with directions to further remand to the Commissioner for further proceedings consistent with this opinion.

**REVERSED and REMANDED with directions.**

---

challenge to the VE's job numbers was made "during administrative proceedings."