**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHELLE SALISE FORD,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>ANDREW M. SAUL, Commissioner of Social Security,<br>*Defendant-Appellee.* | No. 18-35794<br><br>D.C. No.<br>2:18-cv-00099-BAT<br><br><br>OPINION |

Appeal from the United States District Court
for the Western District of Washington
Brian Tsuchida, Magistrate Judge, Presiding

Submitted October 22, 2019[*]
Seattle, Washington

Filed February 20, 2020

Before:  Richard R. Clifton and Sandra S. Ikuta, Circuit
Judges, and Jed S. Rakoff,[**] District Judge.

Opinion by Judge Ikuta

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument.  *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

# SUMMARY[***]

## Social Security

The panel affirmed the district court's decision affirming the Social Security Administration's denial of a claimant's application for disability benefits under Titles II and XVI of the Social Security Act.

The panel first considered the claimant's claim that the administrative law judge ("ALJ") erred in rejecting the opinion of her treating physician, Dr. Medani. The panel concluded that the ALJ provided specific and legitimate reasons for rejecting the opinion. First, there was a conflict between the treating physician's medical opinion and his own notes. Second, there was a conflict between the treating physician's opinion and the claimant's activity level. Finally, Dr. Medani's opinion lacked explanation.

The panel rejected claimant's challenge to the ALJ's rejection of the opinion of Dr. Zipperman, an examining physician. The panel concluded that the ALJ gave specific and legitimate reasons for rejecting the opinion, and the reasons were supported by substantial evidence. First, Dr. Zipperman's opinion regarding claimant's functioning was inconsistent with objective evidence in claimant's record. Second, Dr. Zipperman's opinion was inconsistent with claimant's performance at work. Finally, the ALJ reasonably determined that Dr. Zipperman did not provide useful statements regarding the degree of claimant's limitations. The

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

panel also held that the ALJ's duty to develop the record was not triggered where the ALJ had years of claimant's health records and multiple medical opinions to inform the ALJ's decision.

The panel next considered claimant's argument that the record supported her claim that she met impairment Listings 1.02 and 1.03, which involve impairments that result in an inability to ambulate effectively. The panel held that the ALJ did not err in giving no weight to Dr. Medani's opinions, which concluded that claimant's condition met the criteria of the listings; and therefore, those opinions did not undercut the ALJ's ruling that claimant did not meet Listings 1.02 and 1.03. Second, the panel held that although the ALJ made a factual error in evaluating claimant's ability to walk, the error was harmless because there was ample evidence in the record supporting the ALJ's conclusion that claimant did not meet the Listings. Finally, the ALJ did not err by failing to consider whether a combination of her impairments medically equaled the criteria of Listings 1.02 or 1.03.

Finally, the panel rejected claimant's argument that the ALJ erred in failing to order the vocational expert to identify or provide his source material for his testimony on the number of jobs that existed in the national economy that claimant could perform. First, the ALJ's decision not to issue a subpoena to the vocational expert to produce the underlying data did not violate the applicable regulations. Second, the vocational expert's failure to produce the data underlying her testimony did not undermine its reliability. The panel held that the expert's testimony cleared the low substantial evidence bar. Given its inherent reliability, the qualified vocational expert's testimony as to the number of jobs existing in the national economy that a claimant can perform

was ordinarily sufficient by itself to support the ALJ's finding at step five of the sequential evaluation process. The panel affirmed the ALJ's conclusion at step five that claimant could perform a significant number of other jobs in the national economy, and therefore, she was not disabled.

## COUNSEL

George Andre Fields, Invictus Legal Services, Sacramento, California, for Plaintiff-Appellant.

Brian T. Moran, United States Attorney; Kerry Jane Keefe, Assistant United States Attorney; Mathew W. Pile, Acting Regional Chief Counsel; Christopher J. Brackett, Special Assistant United States Attorney; Office of the General Counsel, Social Security Administration, Region X, Seattle, Washington; for Defendant-Appellee.

## OPINION

IKUTA, Circuit Judge:

In this appeal from a decision of the Social Security Administration, Michelle Ford claims that the administrative law judge (ALJ) erred in: (1) failing to give weight to the opinions of two of her physicians; (2) concluding that her impairments were not per se disabling under the regulatory listings; and (3) denying her request to subpoena the data underlying a vocational expert's testimony. Because the ALJ properly provided specific and legitimate reasons for discounting the opinions of Ford's physicians, correctly concluded that Ford's impairments did not meet a listing, and

was entitled to rely on the vocational expert's testimony despite the expert's failure to provide information about the sources underlying the testimony, we affirm.

I

To determine whether an individual is disabled within the meaning of the Social Security Act, and therefore eligible for benefits, an ALJ follows a five-step sequential evaluation. *See* 20 C.F.R. § 404.1520.[1]  The burden of proof is on the claimant at steps one through four.  *See Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step one, the ALJ must determine if the claimant is presently engaged in a "substantial gainful activity," § 404.1520(a)(4)(i), defined as "work done for pay or profit that involves significant mental or physical activities," *Lewis v. Apfel*, 236 F.3d 503, 515 (9th Cir. 2001) (citing §§ 404.1571–404.1572, 416.971–416.975).  At step two, the ALJ decides whether the claimant's impairment or combination of impairments is "severe," § 404.1520(a)(4)(ii), meaning that it significantly limits the claimant's "physical

---

[1] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income.  Ford brought claims under both programs.  Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI).  For convenience, we cite only the regulations governing disability determinations under Title II.

or mental ability to do basic work activities," § 404.1522(a); *see Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).

At step three, the ALJ evaluates whether the claimant has an impairment, or combination of impairments, that meets or equals the criteria of any of the impairments listed in the "Listing of Impairments" (referred to as the "listings"). *See* § 404.1520(a)(4)(iii); 20 C.F.R. Pt. 404 Subpt. P, App. 1 (pt. A). The listings describe impairments that are considered "to be severe enough to prevent an individual from doing any gainful activity." § 404.1525(a). Each impairment is described in terms of "the objective medical and other findings needed to satisfy the criteria of that listing." § 404.1525(c)(3). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (footnote omitted). If an impairment does not meet a listing, it may nevertheless be "medically equivalent to a listed impairment" if the claimant's "symptoms, signs, and laboratory findings are at least equal in severity to" those of a listed impairment. § 404.1529(d)(3).[2] But a claimant cannot base a claim of

---

[2] "Symptoms means your own description of your physical or mental impairment." § 404.1502(i).

"Signs means one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory,

equivalence on symptoms alone. Even if the claimant alleges pain or other symptoms that makes the impairment more severe, the clamant's impairment does not medically equal a listed impairment unless the claimant has signs and laboratory findings that are equal in severity to those set forth in a listing. § 404.1529(d)(3). If a claimant's impairments meet or equal the criteria of a listing, the claimant is considered disabled. § 404.1520(d).

If the claimant does not meet or equal a listing, the ALJ proceeds to step four, where the ALJ assesses the claimant's residual functional capacity (RFC)**[3]** to determine whether the claimant can perform past relevant work, § 404.1520(e), which is defined as "work that [the claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it," § 404.1560(b)(1). If the ALJ determines, based on the RFC, that the claimant can perform past relevant work, the claimant is not disabled. § 404.1520(f).

At step five, the burden shifts to the agency to prove that "the claimant can perform a significant number of other jobs

---

orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated." § 404.1502(g).

"Laboratory findings means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques. Diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." § 404.1502(c).

**[3]** A claimant's RFC is defined as "the most [the claimant] can still do despite [the claimant's] limitations." § 404.1545(a)(1).

in the national economy." *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002). To meet this burden, the ALJ may rely on the Medical-Vocational Guidelines found at 20 C.F.R. Pt. 404 Subpt. P, App. 2,[4] or on the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). "[A] vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy." § 404.1560(b)(2). An ALJ may also use "other resources, such as the 'Dictionary of Occupational Titles' and its companion volumes and supplements, published by the Department of Labor." *Id.*

Throughout the five-step evaluation, the ALJ "is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

II

We now turn to the facts of this case. On October 24, 2008, Michelle Ford applied for disability benefits under Title II and XVI. Her first disability application was denied in

---

[4] The Medical-Vocational Guidelines "relieve the Secretary of the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy." *Heckler v. Campbell*, 461 U.S. 458, 461 (1983). The Guidelines "consist of a matrix of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Id.* at 461–62 (footnotes omitted).

2011; the ALJ found that Ford was not disabled for the period between August 2007 and March 2011, and that decision became final when Ford declined to appeal it further. Ford then filed a second application for benefits, claiming that she became disabled on March 26, 2011, due to a variety of physical and mental impairments. In January 2015, an ALJ held that Ford was disabled as of November 1, 2012, but not before that date. The Appeals Council vacated the decision and remanded for a new hearing, which the ALJ conducted in November 2016. At the hearing, Ford introduced evidence regarding both her physical and mental impairments. In March 2017, the ALJ ruled that Ford was not disabled for the period from March 26, 2011 to January 2, 2016. The Appeals Council denied Ford's request for review, and the district court affirmed. This appeal followed.

A

The following evidence regarding Ford's alleged physical impairments, adduced at the November 2016 hearing, is relevant to this appeal. Over the course of 2011, Ford routinely visited Dr. Ignatius Medani, her primary care physician. She typically reported back pain, shoulder pain, nausea, and anxiety. Dr. Medani's notes, however, showed few objective findings related to her pain and no consistent abnormalities, outside of a diagnosis of "very mild" carpal tunnel syndrome. He frequently prescribed pain medications at Ford's request. In October 2011, a non-examining physician examined Ford's medical record as part of her application for benefits. His report concluded that Ford was not disabled because her RFC allowed her to perform sedentary work.

In April 2012, Ford had surgery on her right foot for heel spurs and Achilles tendinitis. In December 2012, another non-examining physician reviewed Ford's medical record and concluded that Ford was not disabled. Ford's condition continued to improve over the course of 2013 and 2014. In September 2014, Ford had surgery to remove a bunion and a soft tissue mass on her right toe. During recovery, she used a scooter to avoid putting weight on the affected foot. In August and September 2014, Ford saw Dr. Medani several times for medication refills. The examinations at these visits were unremarkable, and Dr. Medani made few notes. Other than a finding of reduced lumbar range of motion, Dr. Medani noted no abnormalities.

In late September 2014, Dr. Medani filled out an "Arthritis Residual Functional Capacity Questionnaire." The questionnaire set out the disability criteria of Listings 1.02 and 1.03 from the "Listings of Impairments."

Listing 1.02 is entitled "Major dysfunction of a joint(s) (due to any cause)," and describes that impairment as "[c]haracterized by gross anatomical deformity" and involving a "major peripheral weight bearing joint (i.e., hip, knee or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.[5]

---

[5] Listing 1.02 provides, in full:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate

Listing 1.03 is entitled "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint," and the impairment is characterized by "inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.03.[6]

Section 1.00(B)(2)(b) provides a detailed definition of the term "inability to ambulate effectively." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(1). According to the definition section, "[i]nability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." *Id.* Further, "[i]neffective ambulation

---

medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b;

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

[6] Listing 1.03 provides, in full:

Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b , and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." *Id.* The definition also states that "examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(b)(2).

After quoting the criteria for these listings, the questionnaire asked, "In your opinion to a degree of medical certainty, does Ms. Ford's condition meet or equal the above criteria?" Dr. Medani answered "Yes." In response to the next question, "Please explain," he wrote only, "Condition is permanent."

The questionnaire also provided a series of check boxes allowing the doctor to indicate the severity of Ford's conditions. Dr. Medani checked boxes expressing the following opinions: (1) Ford could not sit or stand for more than five minutes at a time or more than two hours in a workday; (2) Ford needed to shift positions at will and take unscheduled breaks every five minutes; (3) Ford needed to elevate her legs for 80% of the day; (4) Ford could rarely lift less than ten pounds and never lift more than ten pounds or engage in actions such as climbing stairs, crouching, or stooping; (5) Ford could perform manipulative actions for no more than 5% of a workday; (6) Ford would miss more than four days of work a month; and (7) Ford was incapable of even low-stress jobs.

From 2015 to 2016, Ford's physical examinations were routinely normal, and she saw Dr. Medani only to have pain medications refilled.

B

In addition to this evidence regarding her physical condition, Ford also provided the following evidence regarding her mental condition. In August 2011, she received counseling at Valley Cities Counseling & Consultation ("Valley Cities"). She reported feeling depressed and anxious, and admitted to taking more medication than prescribed to cope with these feelings. Ford canceled or failed to show up for at least five appointments at Valley Cities over the next four months. In October 2011, a non-examining psychiatrist concluded that Ford could perform simple tasks and familiar complex tasks, attend work within customary tolerances, and complete a normal workday. In June and September 2012, Ford returned to Valley Cities to have her medication refilled. At each visit, she reported increased depression, stress, and anxiety. In September, the counselor diagnosed her with a depressive disorder with psychotic features, but flagged the possibility of substance-induced mood disorder. The counselor also reported her objective observations that Ford was well groomed, alert and oriented as to person, place, time, and situation, her speech was regular in rate and rhythm, and there was no evidence of psychosis.

In November 2012, Ford saw examining psychiatrist Michelle Zipperman for a consultation. In her report, Dr. Zipperman diagnosed Ford with post-traumatic stress disorder, psychosis, depression with psychotic features, and panic disorder. She also indicated that Ford's ability to function in the workplace was "limited." Although Dr. Zipperman noted that "the claimant's ability to accept instructions from supervisors is fair" and "[t]he claimant's ability to interact with coworkers in the public is fair," she

concluded that "claimant's ability to maintain attention and concentration is limited," her "ability to maintain regular attendance in the workplace is limited," and "her ability to deal with the usual stress encountered in the workplace is poor to limited."

Later in November 2012, Ford returned to Valley Cities, and reported a depressed mood, panic attacks, and hallucinations. Again, the counselor found Ford had regular speech, thought, and orientation. Ford missed or cancelled three of her next four appointments. In December 2012, a non-examining psychiatrist again concluded that Ford remained capable of attending work within customary tolerances, working within a routine, and completing simple tasks and familiar complex tasks.

Ford's mental health treatments in 2013 were sporadic. In February 2013, she reported panic attacks, but her counselor noted that her attention and concentration were "fair" and that she "[did] not appear psychotic." Evaluations from her April 2013 visit also showed no evidence of psychosis and normal concentration. In May 2013, Ford's counselor noted Ford was "alert and oriented in all spheres." Ford made occasional mental health visits to Valley Cities over the course of 2013 through 2015. She frequently canceled appointments or failed to show up for them. When she did appear at the scheduled appointments, she showed normal memory, attention, and concentration. She reported no paranoia or delusions at her appointment in November 2014.

## C

The record also contained information about Ford's work history. Ford was able to work in temporary jobs over the course of 2015, and began working part-time at FedEx in May 2016. Ford worked approximately 12 to 13 hours a week at FedEx on tasks that included scanning, labeling and sorting packages. On some days, her shifts lasted for six to eight hours. Ford worked by herself and with coworkers. By July 2017, she had quit her job at FedEx.

## D

At the November 2016 hearing, the ALJ called a vocational expert to testify whether a significant number of jobs existed in the national economy that a claimant with Ford's RFC could perform. The vocational expert testified that 130,000 addresser and 9,800 ink-printing jobs existed nationwide and that Ford's RFC allowed her to perform these jobs. In response to cross-examination about how he had derived those estimates, the vocational expert stated "[m]y numbers come from a variety of sources which include the Department of Labor and the U.S. Chamber of Commerce and actually Social Security, itself, the Census Bureau, through the [International Trade Administration], supply really good numbers and, believe it or not, the state of Alaska has good national numbers." Probing the expert's conclusion regarding the number of addresser jobs, Ford's counsel asked "[w]hich publication indicated that there were that number of jobs?" The expert responded, "I don't have that information in my notes. I typically average all my sources." The counsel then asked, "What were the numbers that you averaged together to get 130,000?" Again, the expert responded, "I don't have that information in my notes,

either." The expert explained that he averages the numbers from his various sources once a year, and then puts those numbers in his notes. Ford's counsel then stated he had no further questions.

A week after the hearing, Ford's attorney asked the ALJ to subpoena the vocational expert's documentation regarding the number of jobs available nationwide. The ALJ did not respond to the subpoena request before rendering a final decision.

E

In her opinion, the ALJ determined that Ford was not engaged in substantial gainful activity. At step two, the ALJ determined that Ford had a number of severe impairments.

Moving to step three, the ALJ rejected Ford's argument that she met or equaled the criteria of any listing. Among other things, the ALJ concluded that Ford did not have a severe ambulation problem, and had used a walker and scooter only during a period of recovery for foot surgery. Therefore, she did not have an ineffective ability to ambulate, and her impairments did not "meet or equal" Listings 1.02 or 1.03.

The ALJ then concluded that Ford had the RFC to perform sedentary work, as defined, with certain limitations. In reaching this conclusion, the ALJ declined to give weight to Dr. Medani's opinion regarding Ford's functional limitations, because it was inconsistent with the objective evidence and poorly explained. The ALJ also declined to give weight to Dr. Zipperman's report, because it included conflicting statements, was inconsistent with other evidence

in the record, and did not provide useful statements about Ford's functional limitations (instead using terms like "fair" and "limited"). The ALJ also gave no weight to Ford's own testimony, finding it to be inconsistent internally and inconsistent with objective medical evidence in the record. Among other things, the ALJ noted that Ford's self-reports were undermined by her propensity to exaggerate her symptoms, her improving physical state, and her poor follow-through with mental health treatment.

Turning to step five, the ALJ concluded that a significant number of jobs existed in the national economy that Ford could perform based on the vocational expert's testimony. Accordingly, the ALJ concluded that Ford was not disabled prior to January 2, 2016. Beginning on that date, however, Ford's age category changed from "younger person" to "person closely approaching advanced age," § 404.1563 (c)–(d), and based on the same RFC, the regulations directed a finding that she was disabled as of that date.

III

On appeal, Ford argues that the ALJ erred in: (1) giving little or no weight to the opinions of two of her physicians, Dr. Medani and Dr. Zipperman; (2) concluding that Ford did not have an impairment that meets or medically equals the severity of the impairments in Listings § 1.02 and 1.03; and (3) failing to grant Ford's request to subpoena the data underlying the vocational expert's testimony. We address each of these alleged errors in turn.

We have jurisdiction under 28 U.S.C. § 1291. "We review the district court's order affirming the ALJ's denial of social security benefits de novo, and will disturb the denial of

benefits only if the decision 'contains legal error or is not supported by substantial evidence.'" *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted) (quoting *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007)). "Substantial evidence . . . is 'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). If the evidence "is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). We may affirm the ALJ's decision even if the ALJ made an error, so long as the error was harmless, meaning it was "inconsequential to the ultimate nondisability determination." *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)). An ALJ's denial of a subpoena is reviewed for abuse of discretion. *See Solis v. Schweiker*, 719 F.2d 301, 302 (9th Cir. 1983).

A

We first consider Ford's claim that the ALJ erred in rejecting the opinion of her treating physician, Dr. Medani.

As a general rule, a treating physician's opinion is entitled to "substantial weight." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988). Nevertheless, the ALJ need not accept the opinion of a treating physician. If a treating physician's opinion is not contradicted by other evidence in the record, the ALJ may reject it only for "clear and convincing" reasons supported by substantial evidence in the record. *See Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir.

2008). But "if the treating doctor's opinion is contradicted by another doctor," the ALJ may discount the treating physician's opinion by giving "specific and legitimate reasons" that are supported by substantial evidence in the record. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." *Thomas*, 278 F.3d at 957.

Because Dr. Medani's opinions regarding Ford's functional capacity were contradicted by the reports of two non-examining physicians, the ALJ could reject the opinions by giving "specific and legitimate reasons" for doing so. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005). According to Ford, the ALJ erred because Dr. Medani's opinions were supported by the record, and the ALJ failed to give adequate reasons for discounting them. We disagree. Among other reasons, the ALJ stated that Dr. Medani's opinion regarding Ford's functional capacity was inconsistent with medical evidence, including previous medical opinions contained in his own notes. This conclusion was supported by substantial evidence in the record. For example, Dr. Medani's opinion indicates that Ford could perform manipulative movements with her hands for only five percent of the day, but his treatment notes state that Ford had "very mild" carpal tunnel syndrome. A conflict between a treating physician's medical opinion and his own notes is a "clear and convincing reason for not relying on the doctor's opinion," and therefore is also a specific and legitimate reason for rejecting it. *Id*.

The ALJ also stated that Dr. Medani's opinion was inconsistent with Ford's activity level. This reason was

likewise supported by substantial evidence. Dr. Medani checked a box stating that Ford could not sit or stand for more than five minutes at a time or two hours in a workday, yet Ford worked six to eight hour shifts at FedEx in 2016 where she was required to sit and stand for long periods of time. A conflict between a treating physician's opinion and a claimant's activity level is a specific and legitimate reason for rejecting the opinion. *See Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir 2001).

Finally, the ALJ noted that Dr. Medani's opinion lacked explanation. An ALJ is not required to take medical opinions at face value, but may take into account the quality of the explanation when determining how much weight to give a medical opinion. *See Orn*, 495 F.3d at 631; 20 C.F.R. § 404.1527(c)(3). While an opinion cannot be rejected merely for being expressed as answers to a check-the-box questionnaire, *Popa v. Berryhill*, 872 F.3d 901, 907 (9th Cir. 2017), "the ALJ may permissibly reject check-off reports that do not contain any explanation of the bases of their conclusions," *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (cleaned up) (quoting *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir.1996)). When Dr. Medani was asked in the questionnaire to explain why Ford met the criteria of Listings 1.02 and 1.03, which require specific medical diagnoses, he wrote only, "Condition is permanent," which does not explain the basis for Dr. Medani's conclusion. Moreover, Dr. Medani's conclusion that Ford met these listings is contradicted by the medical record, which does not contain any reference to a "gross anatomical deformity" (as required by Listing 1.02) or "[r]econstructive surgery or surgical

arthrodesis of a major weight-bearing joint" (as required by Listing 1.03).[7]

## B

Ford also challenges the ALJ's rejection of the opinion of Dr. Zipperman, an examining physician. "The opinion of an examining physician is . . . entitled to greater weight than the opinion of a nonexamining physician." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). If the opinion of an examining doctor is contradicted by another doctor, it "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." *Id.* at 830–31. An ALJ needs less substantial evidence to reject an examining physician's opinion than to reject an treating physician's opinion. *Id.* at 831 n.8.

---

[7] Ford also challenges the ALJ's rejection of Dr Medani's diagnoses of chronic pain syndrome and fibromyalgia. The ALJ based her conclusion on the ground that Dr Medani failed to document the bases for such diagnoses (such as identifying the requisite tender points or ruling out other causes). Under the social security rules, a physician may diagnose fibromyalgia if the patient meets the 1990 or 2010 criteria established by the American College of Rheumatology (ACR). *See* SSR 12-2P, 2012 WL 3104869 (July 25, 2012). According to Ford, the ALJ erred because the ALJ rejected Dr. Medani's diagnosis of fibromyalgia solely on the ground that Dr. Medani did not explain how Ford's condition satisfied the 1990 criteria, and failed to recognize that the medical documentation and opinions from Dr. Medani demonstrate that Ford's condition met the 2010 criteria. This argument fails. Dr. Medani's diagnosis consisted only of the single word "fibromyalgia," and did not explain how Ford met either the 1990 or the 2010 criteria. Nor does Ford point to evidence in the record satisfying the 2010 criteria. Moreover, because both the 1990 and 2010 criteria require a physician to rule out other possible causes of a claimant's pain, SSR 12-2P(II)(A)(3), (B)(3), the ALJ's determination that Dr. Medani failed to do so establishes that Dr. Medani's fibromyalgia diagnosis does not meet either criterion.

Ford claims that the ALJ erred in rejecting Dr. Zipperman's opinion because the ALJ's reasons for doing so were not supported by the record. Again, we disagree. Here, Dr. Zipperman's opinion was contradicted by the opinions of other physicians, and so the ALJ was required to give only "specific and legitimate" reasons for rejecting the opinion. The ALJ did so, and her reasons were supported by substantial evidence.

First, the ALJ concluded that Dr. Zipperman's opinion regarding Ford's functioning was inconsistent with objective evidence in Ford's record. Substantial evidence supports this conclusion. For instance, Dr. Zipperman concluded that Ford was highly distractible and her ability to concentrate was limited, but other mental health professionals found that Ford had normal concentration and thought processes. Although Ford argues that the ALJ failed to recognize the inherently variable nature of mental illness, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Tommasetti*, 533 F.3d at 1038.

The ALJ also found that Dr. Zipperman's opinion was inconsistent with Ford's performance at work. This finding is also supported by substantial evidence. Dr. Zipperman concluded that Ford's ability to maintain regular work attendance was limited, her ability to deal with usual workplace stress was poor to limited, and her ability to perform work duties at a sufficient pace was poor. This conclusion was inconsistent with Ford's work for FedEx, which demonstrated an ability to sustain a work schedule, tolerate work-related stress, and perform simple tasks. An ALJ may consider any work activity, including part-time work, in determining whether a claimant is disabled, *see*

*Drouin v. Sullivan*, 966 F.2d 1255, 1258 (9th Cir. 1992), and here Ford's own testimony established that she was able to work occasional eight-hour shifts.

Finally, the ALJ determined that Dr. Zipperman did not provide useful statements regarding the degree of Ford's limitations. Here, the ALJ found that Dr. Zipperman's descriptions of Ford's ability to perform in the workplace as "limited" or "fair" were not useful because they failed to specify Ford's functional limits. Therefore, the ALJ could reasonably conclude these characterizations were inadequate for determining RFC. Ford contends that the ALJ should have recontacted Dr. Zipperman to further develop the record regarding the meaning of "fair" and "limited" in Zipperman's opinions. *See* 20 C.F.R. § 404.1520b(b)(2)(i). But "[a]n ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001). Given that the ALJ had years of Ford's mental health records and multiple opinions from non-examining psychiatrists to inform her decision, this duty was not triggered.[8]

### C

We next turn to Ford's argument that the record supports her claim that she meets Listings 1.02 and 1.03, and the

---

[8] Because the ALJ provided specific and legitimate reasons supported by substantial evidence to justify her rejection of Dr. Zipperman's opinion, we do not address Ford's argument that other reasons provided by the ALJ were not supported by the record. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008).

ALJ's conclusion to the contrary was not supported by substantial evidence.

In making this argument, Ford relies primarily on Dr. Medani's conclusion that her condition meets the criteria of these two listings. For the reasons explained above, however, the ALJ did not err in giving Dr. Medani's opinions no weight, and therefore, these opinions do not undercut the ALJ's ruling.[9]

Ford also argues that the ALJ made both a legal and factual error that undermine the conclusion that her condition does not meet the listings. First, she claims that the ALJ made a legal error in mistakenly concluding that a claimant cannot meet either listing unless the claimant uses an assistive device. This argument mischaracterizes the ALJ's opinion. The ALJ did not state or suggest that use of an assistive device was necessary to prove ineffective ability to ambulate. Rather, the ALJ stated that Ford did not use "any assistive device for long-term" in connection with her observation that Ford had used a walker and scooter on a temporary basis during recovery from foot surgery, but otherwise did not require such devices. Moreover, the ALJ's determination that the record was devoid of evidence that Ford lacked the ability to ambulate or had any severe ambulation problem was based on other evidence in the record, such as Ford's "self-reports or remarks by providers."

---

[9] Even if the ALJ had decided to credit Dr. Medani's opinion, the applicable regulations instruct that such a "[s]tatement[] about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments" would be "neither valuable nor persuasive." 20 C.F.R. § 404.1520b(c)(3)(iv).

Second, Ford argues that the ALJ erred in evaluating Ford's ability to walk. Ford points to the "Function Report - Adult" that she filled out in August 2011 as part of her claims process. In response to the question, "How far can you walk before needing to stop and rest?" Ford responded "maybe 1/4 of a block."[10] The ALJ, however, mistakenly characterized these reports as stating that Ford "could walk maybe 1/4 mile." Although the ALJ made a factual error on this point, the misstatement is harmless because there is ample evidence in the record supporting the ALJ's conclusion that Ford did not meet Listing 1.02 or 1.03. Among other things, there is no evidence in the record that Ford suffered a gross anatomical deformity, one of the required criteria to meet Listing 1.02, nor any evidence that she had reconstructive surgery of a major weight-bearing joint, one of the required criteria to meet Listing 1.03. Because a claimant's impairment does not match a listing unless it meets "*all* of the specified medical criteria," *Sullivan*, 493 U.S. at 530, the ALJ's error in considering how far Ford could walk is "inconsequential to the ultimate nondisability determination," *Tommasetti*, 533 F.3d at 1038 (citation omitted).

Finally, Ford argues that the ALJ erred by failing to consider whether a combination of her impairments medically equalled the criteria of Listings 1.02 or 1.03. This argument also fails, because "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch*, 400 F.3d at 683; *see also Lewis*, 236 F.3d at 514. While Ford's attorney made passing

---

[10] A non-examining physician repeated Ford's claim that her "walk tolerance is 1/4 block."

reference to a "combination of impairments" at the administrative hearing before the ALJ, he did not argue or explain how such a combination was medically equal to a gross anatomical deformity under Listing 1.02 or a reconstructive surgery of a major weight-bearing joint under Listing 1.03. Because the ALJ did not have an obligation to discuss medical equivalency sua sponte, the ALJ did not err in failing to do so. *See Burch*, 400 F.3d at 683.

D

Finally, Ford argues that the ALJ erred in failing to order the vocational expert to identify or provide his source material for his testimony on the number of jobs that exist in the national economy that Ford could perform. Ford first claims that she needed the underlying data to make a meaningful challenge to the vocational expert's testimony. According to Ford, the ALJ's failure to issue a subpoena requiring the vocational expert to produce the underlying data violated the applicable regulations and procedural rules, and violated her due process rights. Second, Ford argues that the vocational expert's failure to produce the data underlying his testimony undermined its reliability, and therefore the testimony did not constitute substantial evidence supporting the ALJ's determination at step five.

We disagree on both points. First, the ALJ's decision not to issue a subpoena to the vocational expert did not violate the applicable regulations. Under the regulations, "[w]hen it is reasonably necessary for the full presentation of a case" a party may request that the ALJ issue subpoenas "for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing." 20 C.F.R § 404.950(d)(1). To obtain such a subpoena, a party

"must file a written request for the issuance of a subpoena with the administrative law judge . . . at least 5 business days before the hearing date" unless the party shows that it has an "unusual, unexpected, or unavoidable circumstance" beyond the party's control, as listed in § 404.935(b), which prevented the party from doing so. 20 C.F.R. § 404.950(d)(2) (2013).[11] Here, Ford made her request for a subpoena a week after the hearing. Therefore, she did not meet the regulatory requirement that such requests be made "at least 5 days before the hearing date." Ford does not point to any authority entitling a claimant to make a post-hearing request or requiring an ALJ to consider issuing a post-hearing subpoena. Nor does she argue that an "unusual, unexpected, or unavoidable circumstance" prevented her from making her request at least 5 days before the hearing date. Accordingly, the ALJ did not violate the applicable regulations.

Nor is there any "free-standing procedural rule under which a vocational expert would always have to produce [her underlying data] upon request." *Biestek*, 139 S. Ct. at 1154. In federal court, "an expert witness must produce all data she has considered in reaching her conclusions," but "no similar requirement applies in SSA hearings." *Id.* (citing Fed. R. Civ. P. 26(a)(2)(B)). We have likewise held that "[t]he requirements for the admissibility of expert testimony under Federal Rule of Evidence 702 . . . do not apply to the admission of evidence in Social Security administrative proceedings." *Bayliss*, 427 F.3d at 1218 n.4. Rather, "[a vocational expert]'s recognized expertise provides the

---

[11] This regulation was subsequently amended to require the request for a subpoena to be made 10 days prior to the hearing. 20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(1).

necessary foundation for his or her testimony" and "no additional foundation is required." *Id.* at 1281.**[12]**

Second, Ford argues that the vocational expert's failure to produce the data underlying her testimony undermined its reliability. Therefore, Ford contends, the expert's testimony did not constitute substantial evidence of the number of jobs that exist in the national economy. This argument also fails. Our review of an ALJ's fact-finding for substantial evidence is deferential, and "[t]he threshold for such evidentiary sufficiency is not high." *Biestek*, 139 S. Ct at 1154. Substantial evidence is "more than a mere scintilla" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted). Moreover, our inquiry "defers to the presiding ALJ, who has seen the hearing up close." *Id.* at 1157.

Given our deferential substantial evidence review, there is no "categorical rule, applying to every case in which a vocational expert refuses a request for underlying data," which would make an expert's testimony per se unreliable.

---

**[12]** Ford did not argue to the district court that the ALJ's failure to obtain the vocational expert's underlying data violated her due process rights; therefore, she forfeited this issue. *See United States v. Flores-Montano*, 424 F.3d 1044, 1047 (9th Cir. 2005). In any event, this argument is meritless. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Here, Ford had a meaningful opportunity to present her case to the ALJ, to cross-examine witnesses, and even to submit rebuttal evidence after her hearing. *See Shaibi v. Berryhill*, 883 F.3d 1102, 1110 (9th Cir. 2017). Due process does not require any further procedural protections in this context. *Cf. Richardson v. Perales*, 402 U.S. 389, 402 (1971).

*Id.* Rather, "the inquiry, as is usually true in determining the substantiality of evidence, is case-by-case," *id.*, and the court must consider the evidence in the record in each individual case. In some cases, the "expert's withholding of [underlying] data, when combined with other aspects of the record, will prevent [the expert's] testimony from qualifying as substantial evidence."[13] *Id.* This could occur, for instance, if the expert's testimony lacks "markers of reliability," and "the expert has no good reason to keep the data private." *Id.* Likewise, the expert's "withholding of data may count against" the expert's opinion, such as where the expert lacked strong qualifications and offered only "testimony that is so feeble, or contradicted, that it would fail to clear the substantial-evidence bar." *Id.* at 1155–56. But in many of cases, where the expert is qualified and presents cogent testimony that does not conflict with other evidence in the record, "the expert's testimony still will clear (even handily so) the more-than-a-mere-scintilla threshold" even when the expert declines to provide the underlying data. *Id.* at 1157.

Here, the expert's testimony cleared the low substantial evidence bar. Ford points to no indicia of unreliability in the expert's testimony—she does not argue that the expert lacked the necessary qualifications, that his testimony was untrustworthy, or that the testimony was contradicted by

---

[13] Although Ford points to a social security handbook that advises vocational experts to bring the sources supporting their estimates to the Social Security hearing, *see* Social Security Administration, *Vocational Expert Handbook*, 37 (Aug. 2017), an expert's failure to comply with such a best practice does not, without more, make the testimony untrustworthy, *see Biestek*, 139 S. Ct. at 1155 (noting that an expert's unsupported testimony may constitute substantial evidence even though the expert's "testimony would be even better" if the expert had produced supporting data, which is a "best practice for the SSA and its experts").

other evidence in the record.[14]  Moreover, unlike the expert in *Biestek*, the expert here did not decline to supply his underlying sources; rather, he merely stated that he did not have the information in his notes.  Ford does not contend that the vocational expert's estimate is in "obvious or apparent" conflict with estimates provided in the Dictionary of Occupational Titles (DOT), *see Lamear v. Berryhill*, 865 F.3d 1201, 1205 (9th Cir. 2017), or contradicts the Medical-Vocational Guidelines, *see Swenson v. Sullivan*, 876 F.2d 683, 689 (9th Cir. 1989), which would oblige the ALJ to sua sponte investigate and resolve the conflict.  Indeed, Ford fails to identify any ambiguity or gap in the expert's testimony, and so the ALJ's duty to develop the record was not triggered.  *Cf. Mayes*, 276 F.3d at 459–60.

Ford does not identify any evidence undermining the vocational expert's testimony.  We have long held that "in the absence of any contrary evidence, a [vocational expert's] testimony is one type of job information that is regarded as inherently reliable; thus, there is no need for an ALJ to assess

---

[14] Contrary to Ford's argument that without access to the expert's methodology and data she cannot rebut the expert's testimony, Ford could have challenged the expert's testimony in several ways.  A claimant may challenge evidence on the ground that it conflicts with the DOT or the Medical-Vocational Guidelines, or on the ground that it differs from those provided by the County Business Patterns (CBP) or Occupational Outlook Handbook (OOH).  The ALJ must consider the weight of such challenges as it makes its finding at step five.  *See Shaibi*, 883 F.3d at 1110.  Alternatively, a claimant may request to "submit supplemental briefing or interrogatories contrasting the [vocational expert]'s specific job estimates with estimates of the claimant's own."  *Id.*  If the ALJ declines this request, "the claimant may raise new evidence . . . before the Appeals Council, provided that evidence is both relevant and 'relates to the period on or before the ALJ's decision.'"  *Id.* (quoting *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012)).

its reliability." *Buck v. Berryhill*, 869 F.3d 1040, 1051 (9th Cir. 2017). Given its inherent reliability, a qualified vocational expert's testimony as to the number of jobs existing in the national economy that a claimant can perform is ordinarily sufficient by itself to support an ALJ's step-five finding. *See Tackett*, 180 F.3d at 1100 ("[T]he Commissioner [can] meet the burden of showing that there is other work in 'significant' numbers in the national economy that [a] claimant can perform . . . by the testimony of a vocational expert.") (citation omitted); *Barker v. Sec'y of Health and Human Servs.*, 882 F.2d 1474, 1479–80 (9th Cir. 1989). Therefore, we conclude that the expert's testimony here is "the kind of evidence—far more than a mere scintilla—that a reasonable mind might accept as adequate to support a finding about job availability." *Biestek*, 139 S. Ct. at 1155 (cleaned up). Accordingly, we affirm the ALJ's conclusion at step five.

**AFFIRMED**.