# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES BOYD WISCHMANN,

Plaintiff-Appellant,

v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

Defendant-Appellee.

No. 21-35914

D.C. No.
2:20-cv-01673-
MAT

OPINION

Appeal from the United States District Court
for the Western District of Washington
Mary Alice Theiler, Magistrate Judge, Presiding

Argued and Submitted November 8, 2022
Seattle, Washington

Filed May 17, 2023

Before:  Sandra S. Ikuta and Daniel P. Collins, Circuit
Judges, and Sidney A. Fitzwater,[*] District Judge.

Opinion by Judge Ikuta

---

[*] The Honorable Sidney A. Fitzwater, United States District Judge for the Northern District of Texas, sitting by designation.

## SUMMARY[**]

### Social Security

The panel affirmed the district court's decision upholding the Commissioner of Social Security's denial of James Wischmann's application for benefits under the Social Security Act.

Relying on the vocational expert ("VE")'s testimony, the administrative law judge ("ALJ") found that there were a significant number of jobs in the national economy that Wischmann could perform, and, therefore, Wischmann was not disabled. Wischmann's attorney sent a letter to the Appeals Council asking it to review the ALJ's finding that there were a significant number of jobs in the national economy that Wischmann could perform. The Appeals Council made the attorney's letter and a six-page attachment part of the record, and denied Wischmann's request for review of the ALJ's disability determination because it "found no reason under [the] rules to review the Administrative Law Judge's decision."

On appeal, Wischmann challenged only the ALJ's conclusion that there were a significant number of jobs in the national economy that a person with Wischmann's limitations, age, education, and experience could perform. The panel held that to determine whether the ALJ had a duty to address a conflict in job-number evidence (and failed to discharge that duty), it considers on a case-by-case basis whether new evidence submitted by a claimant is

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

"meritless or immaterial" or has "significant probative value."

Because Wischmann did not present his job-number evidence to the ALJ during or after the hearing, the ALJ did not have any occasion to address the purported inconsistency between the VE's estimates and Wischmann's contrary estimates. The panel considered whether Wischmann's estimates were both significant and probative. The panel held that the letter by Wischmann's counsel and the six pages of printouts together provided no basis to conclude that these results qualified as significant and probative evidence. The letter provided no information about how the job numbers were produced, other than the name of the software program used. Nor do the six pages of attached printout support the letter's assertions. The panel held that because the letter and attachments were not probative evidence, they did not give rise to the sort of inconsistency in the evidence that an ALJ was required to resolve. Therefore, the panel concluded that there was no need to remand. The panel rejected Wischmann's argument that his assertion—that he (or his attorney) used Job Browser Pro to produce contradictory estimates of job numbers that were significantly lower than the VE's estimate—was sufficient to require remand.

**COUNSEL**

Paul M. Warren (argued) and Kevin Kerr, Kerr Robichaux & Carroll, Portland, Oregon, for Plaintiff-Appellant.

Shata L. Stucky (argued), Assistant Regional Counsel; Nicole Jabaily, Acting Regional Chief Counsel, Seattle Region X; Social Security Administration, Office of the General Counsel; Seattle, Washington; Kerry Jane Keefe, Assistant United States Attorney; Nicholas W. Brown, United States Attorney; Office of the United States Attorney; Seattle, Washington; for Defendant-Appellee.

**OPINION**

IKUTA, Circuit Judge:

This case requires us to decide whether an Administrative Law Judge (ALJ) must reconcile a purported inconsistency between testimony of a vocational expert (VE) as to the number of jobs available in the national economy that a claimant can perform and the claimant's assertedly contrary job-number estimates submitted to the Appeals Council after the ALJ's determination and made part of the administrative record. Where, as here, the new evidence is not probative, the ALJ has no duty to resolve the inconsistency, and we must uphold the agency's final decision. We affirm.

## I

## A

James Wischmann applied for disability insurance benefits and supplemental security income in November 2018, alleging that he was disabled since January 1, 2018 due to degenerative disc disease, radiculopathy, and spondylosis.  The ALJ determined that Wischmann's impairments left him with the residual functional capacity to perform light work with certain limitations.  Although Wischmann could not perform his past relevant work, the ALJ considered the testimony of a VE, who identified other work existing in significant numbers in the national economy that a person with Wischmann's limitations could perform.  The VE identified three main occupations: bakery helper (59,000 positions nationwide), counter clerk (25,000 positions nationwide), and agricultural sorter (10,600 positions nationwide).

At the ALJ hearing in January 2020, Wischmann's counsel asked the VE how he calculated the numbers for two of those jobs and the data source used for those calculations. The VE stated "[t]he software that we use is SkillTRAN Browser—Job Browser Pro," which is a computer software that is "widely relied upon by vocational experts in estimating the number of relevant jobs available in the national economy." *Purdy v. Berryhill*, 887 F.3d 7, 14 (1st Cir. 2018).  Relying on the VE's testimony, the ALJ found that there was a significant number of jobs in the national economy that Wischmann could perform, and, therefore, Wischmann was not disabled.

B

A VE's estimate of the number of jobs available in the national economy is informed by the VE's experience and expertise, and may be based upon "not only publicly available sources but also 'information obtained directly from employers' and data otherwise developed from [the VE's] own 'experience in job placement or career counseling.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152–53 (2019) (citing SSR 00-4p, 65 Fed. Reg. 75759, 75760 (Dec. 4, 2000)). "[W]e have characterized uncontradicted VE job-numbers testimony as inherently reliable and ordinarily sufficient by itself to support an ALJ's step-five finding." *White v. Kijakazi*, 44 F.4th 828, 835 (9th Cir. 2022) (citation and quotation marks omitted); *see also Ford v. Saul*, 950 F.3d 1141, 1159 (9th Cir. 2020) (stating that "where the [vocational] expert is qualified and presents cogent testimony that does not conflict with other evidence in the record, the expert's testimony" is substantial evidence to support the ALJ's step-five finding (citation and quotation marks omitted)).

Although criticized as having many outdated job descriptions, *see White*, 44 F.4th at 835, the Dictionary of Occupational Titles (DOT) is typically the starting point for VEs to identify the occupations relevant for each claimant's residual functional capacities, *see McClesky v. Astrue*, 606 F.3d 351, 354 (7th Cir. 2010) (describing DOT as "the Bible of vocational experts"); *see also* 20 C.F.R. §§ 404.1566(d)(1), 416.966(d)(1). "The DOT groups jobs into 'occupations' based on their similarities and assigns each occupation a code number." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1281 (11th Cir. 2020). But the DOT does "not provide statistical information about the number of jobs available in the national economy" for each

occupation code.  *Id.*; *see also Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 446 (2d Cir. 2012) ("The DOT, however, just *defines* jobs.  It does not report how many such jobs are available in the economy.").

To obtain information about the numbers of jobs, VEs look to other sources, such as the Bureau of Labor Statistics Occupational Employment Survey (OES) or the Occupational Employment Quarterly (OEQ), compiled by a private organization.  *See Ruenger v. Kijakazi*, 23 F.4th 760, 762 (7th Cir. 2022); *Goode*, 966 F.3d at 1281; *see also Brault*, 683 F.3d at 446.  Both the OES and OEQ assign job-number data to a particular occupation based on the Bureau of Labor Statistics' Standard Occupational Classification (SOC) codes.  To further complicate matters, the criteria for SOC occupation codes are different than the DOT occupation codes.  "The SOC system groups together detailed occupations with similar job duties" in a single code, such that "a single SOC group may contain multiple DOT occupations."  *Goode*, 966 F.3d at 1281.  For example, ten DOT codes could be correlated to a single SOC code, which reports 100,000 total jobs.  *See Brault*, 683 F.3d at 447 n.4.  But that "gives no information at all about how many positions *each* of the ten DOT codes contributed to that total."  *Id.* (emphasis added).  That is especially problematic "if DOT titles with different exertion or skill levels map to the same SOC code," such that a claimant can perform some but not all of the jobs reported as available for the SOC occupation code.  *Id.*  As a result, employment data corresponding to a single SOC occupation code does not correspond to a single DOT occupation code.

The lack of correspondence between DOT occupation codes and SOC employment data requires VEs to determine how many of the jobs available for an SOC code match the

claimant's specific DOT code or codes.  *See Goode*, 966 F.3d at 1283; *Brault*, 683 F.3d at 446.  Proprietary software programs have attempted to bridge this gap by matching various employment data sources' job types to the claimant's DOT code and then estimating the number of available jobs for the DOT occupation code.  SkillTRAN's Job Browser Pro is one such program.[1]  *See White*, 44 F.4th at 837 (describing Job Browser Pro as a "methodology frequently relied on by the [Administration]").

C

In March 2020, Wischmann's attorney sent a letter to the Appeals Council asking it to review the ALJ's finding that there were a significant number of jobs in the national economy that Wischmann could perform.  The attorney claimed the finding was not supported by substantial evidence because "the ALJ improperly found that there were jobs that exist in significant numbers in the national economy that Mr. Wischmann can perform."  After noting that the VE stated he used Job Browser Pro and DOT specific numbers to determine "how many positions there are nationally," the attorney stated that "using Job Browser Pro the data shows that for bakery helper there are 45 positions nationally, for counter clerk there are [1],527 positions nationally, and for agricultural sorter there are

---

[1] For an explanation of SkillTRAN's methodology, see *Defending Your Use of Job Browser Pro Methodology*, SkillTRAN, SkillTRAN.com/index.php/support-area/documentation/223-jbp-defense (last accessed Nov. 9, 2022); Peter J. Lemoine, *Crisis of Confidence: The Inadequacies of Vocational Evidence Presented at Social Security Disability Hearings, Part II* 16, 18–19, Social Security Forum (Sept. 2012) (describing Job Browser Pro's methodology).

4,533 jobs nationally."**2**   That amounted to a total of "6,105 [jobs] available that Mr. Wischmann would be capable of performing," which, the letter contended, is "not enough to be significant."

Six pages of computer printout were attached to this letter.  The first page states "2018 Employment Estimate for: 524.687-022 Bakery Worker, Conveyor Line."   At the bottom of the page, there is a column labeled "TOTAL Industry Employment Estimate."   Under that column, appears the entry "U.S. National."   The next column is labeled "OES Group" and includes the entry "588."   The third column is labeled "Self-Employed" and has one entry, "0."  The fourth column is labeled "DOT Code" and has the number "45."  The final column is labeled "Selt:gulgy-ed" and has the entry "0."

The third page states "2018 Employment Estimate for: 249.366-010 Counter Clerk."   There is a column labeled "TOTAL Industry Employment Estimate," under which appears the entry "U.S. National."   To the right appears a column labeled "QSS-Q.LQ.up" which includes no entry. The next column is labeled "Self-Employed" and includes the entry "14."  The fourth column is labeled "DOT Code," and lists no entry.   And the final column is labeled "Selt:gulgy-ed" and has the entry "14."

The fifth and sixth pages state "2018 Employment Estimate for: 529.687-186 Sorter, Agricultural Produce." The first column is labeled "TOTAL Industry Employment Estimate."   Under that column, appears "U.S. National."

---

2  The letter states "for counter clerk there are I , 527 positions nationally," which we interpret as meaning 1,527 in light of the letter's later statement that the total number of positions is "6, 1 05."

The next column is labeled "QSS-Q.LQ.up" and includes the entry "3,065." The third column is labeled "Self-Employed" and contains the entry "25." The fourth column is labeled "DOT Code" and has no entry. And the fifth column is labeled "Selt:gulgy-ed" and includes the entry "12."

The letter does not reference these six pages, and the pages themselves do not indicate their source. Nor do the pages indicate the process by which the data were generated, or how the information on the pages supports the attorney's claim regarding job numbers in the national economy. Further, the letter's statement of estimated job numbers does not correspond with the numbers in the printouts. The letter states that there are 45 positions for bakery work, 1,527 positions for counter clerk, and 4,533 positions for agricultural sorter. While the page labeled "Bakery Worker" includes the number 45 (under the column labeled DOT code), the remaining attachments do not include the numbers 1,527 or 4,533.

The Appeals Council made the attorney's letter and the six-page attachment part of the record. But the Appeals Council denied Wischmann's request for review of the ALJ's disability determination stating that "[w]e found no reason under our rules to review the Administrative Law Judge's decision." Because the Appeals Council denied review, the ALJ's decision serves as the Commissioner's final agency action. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1161–62 (9th Cir. 2012).

Wischman challenged the final decision in the district court, raising only his claim that the ALJ improperly accepted the VE's testimony regarding the number of jobs in the national economy. The district court upheld the ALJ's decision, and Wischman timely appealed.

We have jurisdiction to review the district court's decision upholding the Commissioner's denial of Wischmann's application. *See* 28 U.S.C. § 1291; *Gardner v. Berryhill*, 856 F.3d 652, 656 (9th Cir. 2017). We review that decision de novo and must determine whether the ALJ's ruling is free of legal error and its findings of fact are supported by substantial evidence. *Brewes*, 682 F.3d at 1161–62. Under that standard, "[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995). Because the Appeals Council accepted Wischmann's new evidence, it became "part of the administrative record, which the district court [and we] must consider." *Brewes*, 682 F.3d at 1163.

II

On appeal, Wischmann challenges only the ALJ's conclusion that there are a significant number of jobs in the national economy that a person with Wischmann's limitations, age, education, and experience can perform. This is the final step in the five-step sequential evaluation process for determining whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).[3]

---

[3] At steps one through four, the ALJ must determine (1) "if the claimant is presently engaged in a 'substantial gainful activity,'" *Ford v. Saul*, 950 F.3d 1141, 1148 (9th Cir. 2020) (citing 20 C.F.R. § 404.1520(a)(4)(i)); (2) "whether the claimant's impairments or combination of impairments is 'severe,'" *id.* (citing 20 C.F.R. § 404.1520(a)(4)(ii)); (3) whether the claimant's impairments or combination of impairments meets or equals the severity of one listed in the Listing of Impairments, *see id.* (citing 20 C.F.R. § 404.1520(a)(4)(iii)); and (4) whether the claimant is capable of performing past relevant work, *see id.* at 1149 (citing 20 C.F.R.

The ALJ has a general duty to resolve inconsistencies in the evidence, which may require obtaining additional evidence. *See* 20 C.F.R. § 404.1520b(b) (setting out the steps the agency may take when "the evidence in [the claimant's] case record is . . . inconsistent"); 20 C.F.R. § 416.920b(b) (same). This duty applies "[t]hroughout the five-step evaluation." *Ford*, 950 F.3d at 1149. For example, under current rules, if there is a conflict between occupational evidence provided by the VE and information in the DOT, the ALJ may not rely on the VE's "evidence to support a determination or decision that the individual is or is not disabled" unless the ALJ explains "how he or she resolved the conflict." SSR 00-4p, 65 Fed. Reg. at 75760; *see also Shaibi v. Berryhill*, 883 F.3d 1102, 1109 (9th Cir. 2018) ("[A]n ALJ is required to investigate and resolve any apparent conflict between the VE's testimony and the DOT, regardless of whether a claimant raises the conflict before the agency."); *Gutierrez v. Colvin*, 844 F.3d 804, 807 (9th Cir. 2016) ("If the [VE's] opinion that the applicant is able to work conflicts with, or seems to conflict with, the requirements listed in the [DOT], then the ALJ must ask the expert to reconcile the conflict before relying on the expert to decide if the claimant is disabled."); *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015) ("The ALJ must ask the [VE] to explain the conflict [between the VE's testimony and the DOT] and then determine whether the [VE's] explanation for the conflict is reasonable before relying on the [VE's] testimony to reach a disability determination." (citation and quotation marks omitted)).

---

§ 404.1420(f)). Wischmann does not challenge the ALJ's decision regarding these steps.

Although the agency has not directly addressed the ALJ's responsibility to resolve a conflict between the VE's job-number estimates and the claimant's job-number estimates, we have held that—as with any other inconsistency in record evidence—the ALJ may have a duty to address such a conflict. *See Buck v. Berryhill*, 869 F.3d 1040, 1051–52 (9th Cir. 2017) (collecting cases); *White*, 44 F.4th at 836–37. That duty arises only where the purportedly inconsistent evidence is both significant and probative, as opposed to "meritless or immaterial." *Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1193–94 (9th Cir. 2022). After all, an ALJ "need not discuss *all* evidence presented to her. Rather, [an ALJ] must explain why 'significant probative evidence has been rejected.'" *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984) (citation omitted).

We have considered both the probative value and significance of conflicting job-number estimates in several cases. In *Kilpatrick*, a claimant challenged the ALJ's reliance on a VE's testimony by submitting a letter to the ALJ which stated contrary estimates of jobs available in the national economy derived by the claimant's attorney. 35 F.4th at 1190–91, 1194. In that case, "there [was] no basis to conclude that these results qualified as significant probative evidence" because the claimant's attorney "had no identified expertise in calculating job figures in the national economy" and "there [were] obvious reasons to question [the attorney's] methodology," given that the data used "was roughly seven years old at the time" and the attorney used an "equal distribution method" that required improbable assumptions. *Id.* at 1194. Because the "estimated job numbers lacked a sufficient foundation," we declined to consider the degree of the conflict between the competing

job numbers and upheld the ALJ's conclusion. *Id.* at 1194–95.

In cases where the conflicting job-number estimates were accepted as probative, we turned to the question whether the new evidence was significant, which in the context of job-number estimates is a measure of the discrepancy between the VE's estimates (upon which the ALJ relied to render the step-five finding) and the claimant's estimates. *See Buck*, 869 F.3d 1040; *White*, 44 F.4th 828. In *Buck*, the ALJ had "curtailed Buck's cross-examination of the VE" and then ignored his submission of competing numbers. 869 F.3d at 1047. We "presum[ed]" that Buck's calculations were probative and held that the "vast discrepancy between the VE's" estimate of 843,800 jobs and the claimant's estimate of 2,296 jobs was "simply too striking to be ignored," such that the "inconsistency in the record [had to] be addressed by the ALJ on remand." *Id.* at 1047, 1052.

We reached a similar conclusion in *White*, 44 F.4th 828. In that case, a VE testified that she used an "automated program, 'SkillTRAN'" to determine that the claimant would be able to perform the occupations of table worker, assembler, and film touch-up inspector, which had approximately 72,000; 65,000; and 32,000 jobs, respectively, in the national economy. *Id.* at 831. Based on this testimony, the ALJ concluded that the claimant was not disabled. *Id.* at 832. The claimant requested a review of this decision with the Appeals Council and submitted "job estimates generated using SkillTRAN's 'flagship program,' Job Browser Pro," which showed "there were only 2,957 table worker jobs, 0 assembler jobs, and 1,333 film touch-up inspector jobs in the national economy." *Id.* The Appeals Council declined review. *Id.* at 833.

On appeal, we then considered whether the claimant's job numbers had probative value and concluded (without analysis) that the claimant's "conflicting evidence" was "produced using the same methodology as that used by the VE" and was "'significant' and 'probative.'" *Id.* at 837 (citation omitted). Given the large discrepancy between the VE's testimony and the claimant's new evidence, we held that remand to the ALJ was appropriate. *See id.*

In sum, to determine whether the ALJ had a duty to address a conflict in job-number evidence (and failed to discharge that duty), we consider on a case-by-case basis whether new evidence submitted by a claimant is "meritless or immaterial" or has "significant probative" value. *Kilpatrick*, 35 F.4th at 1193. If the new evidence is significant and probative, we must remand to the ALJ to address the inconsistency in the record evidence. *See White*, 44 F.4th at 837; *Buck*, 869 F.3d at 1052. Otherwise, if the claimant's new evidence is either not probative or not significant, we must uphold the ALJ's determination. *See Kilpatrick*, 35 F.4th at 1195.

III

We now turn to Wischmann's challenge to the ALJ's conclusion, based on the VE's testimony, that there were a significant number of jobs in the national economy that Wischmann could perform. Wischmann preserved his challenge to the VE's job-number estimates by asking the VE during the hearing how he had calculated the estimates for two of the jobs and the data source used for his estimates and by presenting contrary job-number estimates to the Appeals Council, which the Appeals Council considered and made part of the record. *See Shaibi*, 883 F.3d at 1110; *White*, 44 F.4th at 831–32, 837.

Because Wischmann did not present his evidence to the ALJ during or after the hearing, the ALJ did not have any occasion to address the purported inconsistency between the VE's estimates and Wischmann's contrary estimates. We therefore must determine whether Wischmann's estimates were both significant and probative, which would require a remand to the ALJ to reconsider his step-five finding that there were a significant number of jobs in the national economy that Wischmann could perform (based on the VE's testimony). *See White*, 44 F.4th at 836–37.

We begin by considering whether the evidence submitted by Wischmann is probative. The letter by Wischmann's counsel and the six pages of printouts together provide "no basis to conclude that these results qualified as significant probative evidence." *Kilpatrick*, 35 F.4th at 1194. The letter does not show that the data enclosed "were produced using the same methodology as that used by the VE." *White*, 44 F.4th at 837. The letter states only that Job Browser Pro produced a lower number of positions available nationally for baker, counter clerk, and agricultural sorter. But the letter provides no information about how the job numbers were produced, other than the name of the software program used. A software program, however, is merely a tool that must be used appropriately to produce reliable results. Given that SkillTRAN's Job Browser Pro software is meant to assist a VE in performing a complex matching exercise of various sources of information from official and private sources, *see supra* at 6–8, experience in using the program and interpreting the output would ordinarily be necessary to produce probative results. But the letter does not state who produced the outputs—whether a VE with expertise in developing job numbers or the attorney himself, who has "no identified expertise in calculating job figures in

the national economy." *Kilpatrick*, 35 F.4th at 1194.  Nor does the letter establish that the attorney replicated a methodology that was set forth by the VE at the hearing.  In addition, the letter provides no information about what queries were entered into the computer program, what variables were changed, or what filters were applied to the data.  Nor does the letter state which version of the program was used, so we do not know whether the information used by the program was current or out of date.  *See id.* (noting that where the claimant's attorney used "data that was roughly seven years old at the time" to calculate the job-number estimates, "there [were] obvious reasons to question [the] methodology").

Nor do the six pages of attached printout support the letter's assertions.  Neither the letter nor the pages themselves state that the printout data was produced with Job Browser Pro.  The raw data set out on these pages, *see supra* at 9–10, is not comprehensible to a lay person, and Wischmann does not provide the interpretation necessary to make the pages meaningful to a court.  *Cf. Decker v. Berryhill*, 856 F.3d 659, 663–65 (9th Cir. 2017) (stating that a district court was not required to interpret raw laboratory data to support the claimant's argument, in the absence of any interpretation that "would have made them more meaningful" to the court).  And because "an ALJ need not discuss evidence" from a lay witness that the "lay witness is 'not competent' to provide," the uninterpreted data is not probative.  *Kilpatrick*, 35 F.4th at 1194 (citing *Tobeler v. Colvin*, 749 F.3d 830, 834 (9th Cir. 2014)).  Moreover, there are "obvious reasons to question" the reliability of the attached computer printouts.  *Id.*  Among other things, the letter's statement of estimated job numbers does not fully correspond to the numbers in the printouts.  *See supra* at 10.

In short, because the letter and attachments are not probative evidence, they do not give rise to the sort of inconsistency in the evidence that an ALJ is required to resolve. *See Kilpatrick*, 35 F.4th at 1193–94. Therefore, there is no need to remand.[4]

In opposing this conclusion, Wischmann argues that his assertion that he (or his attorney) used Job Browser Pro to produce contradictory estimates of job numbers that were significantly lower than the VE's estimate is sufficient to require remand. We disagree. An ALJ has no duty to consider evidence that is "meritless or immaterial." *Id.* at 1193. Thus, the bare assertion by Wischmann's attorney coupled with the uninterpreted raw data do not give rise to a material inconsistency that the ALJ is required to resolve. By contrast, in *White*, we concluded that the claimant *had* shown that "his job estimates were produced using the same methodology as that used by the VE" and were "'significant' and 'probative.'" 44 F.3d at 837 (citation omitted). And in *Buck*, we were willing to "presum[e]," for purposes of our decision, that the claimant's competing numbers were probative when the ALJ had "curtailed [the claimant's] cross-examination" on that very subject and then simply disregarded the claimant's numbers without explanation. 869 F.3d at 1047, 1052. Contrary to Wischmann's argument, the ALJ does not have an obligation to address the claimant's evidence of job numbers in the national economy, unless that evidence is significant and probative. *See*

---

[4] Because we decide on this ground, we need not consider whether the disparity between the VE and Wischmann's job-number estimates is significant. *See Kilpatrick,* 35 F.4th at 1195 (taking this approach).

*Vincent*, 739 F.2d at 1394–95 (recognizing that an ALJ "need not discuss *all* evidence presented to her").

**AFFIRMED.**